Filed 10/30/23  P. v. Ewell CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOHN WESLEY EWELL,<br><br>　　　Defendant and Appellant. | B311450<br><br>(Los Angeles County<br>Super. Ct. No. BA400028) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa B. Lench, Judge.  Affirmed.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Appellant John Wesley Ewell moved to suppress evidence obtained in connection with his October 23, 2010 arrest; to quash and traverse the search warrant issued that same day for his residence and vehicle; and to suppress evidence found in the ensuing searches. After the trial court denied his motions, appellant pled no contest to four counts of first degree robbery in violation of Penal Code[1] section 211 and four counts of murder (§ 187) with robbery and special circumstance allegations pursuant to section 190.2, subdivision (a)(17).[2] He was sentenced to four terms of life without the possibility of parole for the murders, and four mid-terms of four years for the robbery convictions, stayed pursuant to section 654.

He now appeals the denial of those motions. Appellant was arrested after officers investigating the home invasion robbery-murders of Leamon and Robyn Turnage reviewed video footage from four locations where a Turnage ATM card was being used. Investigating officers concluded that appellant was the person using it. Appellant contends there was no probable cause for his warrantless arrest because there were no reasonable grounds to believe he was the person using Robyn Turnage's ATM card.

Investigators obtained a search warrant for appellant's home and car, based on essentially the same facts which prompted his arrest. Appellant contends the search warrant was facially invalid for essentially the same reasons as the arrest. Appellant brought a contemporaneous motion to traverse the warrant, contending the affidavit supporting the warrant

---

[1] Undesignated statutory references are to the Penal Code.

[2] The People had sought the death penalty against appellant.

2

includes statements made with reckless disregard for the truth. He further contends the warrant was invalid because it failed to describe the items to be seized with reasonable particularity.

Finally, appellant contends the officers exceeded the scope of the warrant when they seized a day planner which contained the address of another robbery-murder victim, Hanna Morcos, and that all items related to the Morcos murder seized after that search were the fruit of the poisonous tree. Appellant seeks suppression of all seized evidence as a remedy for what he characterizes as the officers' flagrant disregard for the scope of the warrant. We see no error in the trial court's denial of all the motions and so affirm the judgment.

## BACKGROUND

On September 24, 2010, appellant murdered Hanna Morcos and stole items, notably foreign coins, from the home on West 137th Street in Hawthorne. On October 13, 2010, appellant murdered Denise Roberts and stole items from her home on South Hoover Street, two houses down from appellant's residence. On October 21, 2010, appellant murdered Leamon and Robyn Turnage and stole items from their home on West 142nd Street in Hawthorne. Appellant bound the wrists or ankles of all four victims.

The Morcos and Roberts murders were unsolved when Los Angeles County Sheriff's Department (LASD) officers went to the Turnage home in the later afternoon of October 22, 2010, to investigate a possible double homicide and discovered the Turnages had been murdered.

Robyn Turnage was bound with black electrical tape around her wrists; there was also black electrical tape around her head. Leamon had black electrical tape around his head, and his

hands were tied behind his back with a white cord or string. A yellow nylon rope was under and around his body.

Empty boxes suggested jewelry had been taken. Robyn's purse had been emptied out in the living room and Leamon's wallet was open on the kitchen table. Credit/debit cards appeared to be missing from both.[3] Investigators noticed a Bank of the West checkbook, contacted a police detective specializing in credit card crimes and asked if he had a source in the banking industry, specifically Bank of the West.

At some point in the investigation, on either October 22 or 23, Detective Hecht spoke with Mohammad Khan, a tenant in a back guest house on the Turnage property. Khan told Detective Hecht that at about 11:30 a.m. on October 21 Leamon Turnage came to Khan's unit with a man in a blue baseball hat, blue work shirt and dark pants. Turnage said the man needed to check the property for a gas leak. Khan described the "gas man" as a black male in his early 50's with a thin build and a thin mustache. Detective Hecht got the impression from Khan that the man was just "smelling" for gas." Khan said they did not smell any gas and left very quickly.

In the very early morning hours of October 23, 2010, Bank of the West representative Hayley McCormick contacted Detective Hecht. She drove to a bank branch, opened it up and logged onto the bank's computer equipment to search for activity. She told investigators that Robyn Turnage's Bank of the West ATM card was being used at ATMs in the area.

---

[3]     Later in the investigation, after the crime scene was released back to the family, family members found several credit cards under a bed in the house.

4

Investigators learned from a Bank of the West employee that bank records showed the Turnage ATM card had been used at 4:24 p.m. on October 21, 2010 at R&F Liquor, at 10:25 a.m. on October 22, 2010 at a Shell gas station at 854 West El Segundo Boulevard in Gardena, and at 10:36 a.m. on October 22, 2010 at a 7-11 store at 861 West Rosecrans Avenue in Gardena. Detective Hecht went to the three locations and viewed surveillance video.

Video from R&F Liquor showed appellant entering and leaving the store twice. [4] One of the exit times was 4:24 p.m. That location did not have a camera focused on the ATM itself.

Video from the Shell station showed appellant conducting an ATM transaction from 10:28 to 10:30 a.m.

Video from the 7-11 showed appellant arriving at the store at 10:40 a.m. That location did not have a camera filming the actual ATM or an outdoor camera.

At the Shell station, appellant is seen on video entering and exiting a red car with a black primer hood and black right front fender; the car is also seen in the R&F Liquor video, and it is reasonable to infer appellant is driving it in the video.

Sometime later, on October 23, 2010, Detective Hecht learned from Bank of the West that the Turnage ATM card had been used again at the same Shell station and the same 7-11, and at an ARCO station at 11259 South Vermont, at 6:54 a.m., 7:00 a.m. and 7:35 a.m. respectively. Detective Hecht viewed videos from the locations, and saw the same black male, believed

---

[4]     To be clear, the person in the videos is a black male with a thin build and a thin mustache. It was Detective Hecht's opinion that this same man was in all the videos, and that the man was appellant.

5

by Detective Hecht to be appellant, at all three locations, and the distinctive red car at the Shell and ARCO stations.

The Shell video showed appellant conducting an ATM transaction from 6:58-7:00 a.m. It also showed the distinctive red car.

The recorded videos from the 7-11 and ARCO station were missing (or perhaps never copied by LASD), but Detective Hecht recalled viewing the videos and seeing appellant. He specifically recalled seeing appellant exiting and entering the red car at the ARCO station.

The LASD Surveillance and Apprehension team began surveillance of the 7-11 and the Shell station as well as a liquor store which was across the street from the Shell station. The Turnage ATM card had been declined there due to daily withdrawal limits. At about 7:00 p.m., LASD Detective Arturo Barrera observed a black male get into the distinctive red car at the liquor store. The team followed the car to 12653 South Hoover Street, where the man got out of the red car and entered the residence. When the man came out about 20 minutes later, officers arrested the man, identified as appellant.

Detective Duval prepared a search warrant for the Hoover Street residence and the red car. The warrant was authorized by a magistrate on October 23, 2010 at 11:26 p.m. Detective Duval and his partner Sergeant Garcia supervised the search, which was conducted by Hawthorne Police Department (HPD) personnel. As relevant to this appeal, an HPD officer discovered an address in a day planner, and other HPD officers recognized it as the address of the Morcos murder.

The next day, Detective Hecht supervised a search of the red car, which had been impounded. LASD Sergeant Alexander

6

MacArthur was present; he was an investigator in the Morcos murder. During the search of the car Detective Hecht seized a blue coin purse containing foreign coins and a black briefcase containing papers. Later that day Detective Hecht gave these items to Sergeant MacArthur.

Detective Duval searched the red car on October 27, 2010, and Detective Hecht searched the car again on October 29, 2010. Additional items were recovered during both searches.

## DISCUSSION

I.      *Probable Cause Supported Appellant's Arrest.*

Officers arrested appellant without a warrant, and appellant moved to suppress all evidence recovered after that arrest, on the ground that officers lacked probable cause to arrest him.

The trial court found there was probable cause to believe appellant was using an ATM card that belonged to Robyn Turnage shortly after the card was likely taken, based on: (1) surveillance video showing a "very distinctive" car at some/all of the ATM locations, which appellant was observed driving very shortly before his arrest; and (2) surveillance videos of the ATM locations showing a person at the locations in close proximity to the times the cards were being used. That person matched the general description of a person observed with Mr. Turnage at the residence the morning of the murders. Thus, the trial court concluded that there was probable cause to arrest appellant for a felony.

The prosecution bears the burden of proving the reasonableness of a warrantless arrest. (*People v. Williams* (1999) 20 Cal.4th 119, 130.) A warrantless arrest is reasonable

7

under the Fourth Amendment where an officer has probable cause to believe that a criminal offense has been or is being committed.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1037 (*Kraft*).)  Probable cause exists if facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime.  (*Ibid.*)  Probable cause "does not demand any showing that such a belief be correct or more likely true than false." (*Texas v. Brown* (1983) 460 U.S. 730, 742 (*Brown*).)  "Probable cause may exist even though there may be some room for doubt." (*People v. Fischer* (1957) 49 Cal.2d 442, 446 (*Fischer*).)  "The test . . . is not whether the evidence upon which the officer made the arrest is sufficient to convict."  (*Ibid.*)

Where an officer makes a warrantless arrest based on a belief there is probable cause to do so, "the officer must testify to the facts or information known to him on which his belief is based" because "the court and not the officer must make the determination whether the officer's belief is based upon reasonable cause."  (*People v. Boyles* (1955) 45 Cal.2d 652, 656.)  In ruling on the motion to suppress, the trial court is "vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences."  (*People v. Woods* (1999) 21 Cal.4th 668, 673.)

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]' "  (*People v. Redd* (2010) 48 Cal.4th 691, 719.)

Appellant contends the trial court erred in finding probable cause because the surveillance videos either do not show him actually conducting an ATM transaction or do not show any transactions at the times provided by Bank of the West for the Turnage card transactions, and thus do not sufficiently connect him to the use of the Turnage ATM card.

The facts related by Detective Hecht for probable cause largely involve the videos from locations where the Turnage ATM card was used. Detective Hecht's testimony, detailed above, shows that appellant appeared at all the locations where the Turnage ATM card was used on October 21, 22, and 23, within minutes of the time Bank of the West records verify the card being used.[5] We find these facts alone to be compelling, but even if they were not sufficient to lead a person of ordinary care and prudence to entertain an honest and strong suspicion that appellant was using the stolen Turnage ATM card, these facts do not stand alone.

Recorded video from the Shell station, the only location with a video camera pointed at the ATM, shows appellant using the ATM within minutes of the time Bank of the West records verify the Turnage ATM card was used on both October 22 and 23, 2010. Appellant focuses on the slight time difference between the time on the videos and the Bank of the West times, and argues that the time discrepancies in the Shell videos, "without

---

[5] The Turnage ATM card was used at four locations: R&F Liquor, the Shell station, the 7-11, and an ARCO station. Detective Hecht testified that he viewed video from all the locations. There was an attempted use of the card at J&S Liquor on October 23, 2010, but the card was declined. Detective Hecht did not remember any video from J&S Liquor.

9

further verification, cast doubt" on whether he was using the Turnage ATM card. Of course, "Probable cause may exist even though there may be some room for doubt." (*Fischer, supra,* 49 Cal.2d at p. 446.)

The video surveillance recordings, ATM internal time clocks (if they played any role in the time differences) and the Bank of the West records are all forms of computer records.[6] Generally, inaccuracies in computer records go to the weight of the evidence, not its admissibility. (*People v. Martinez* (2000) 22 Cal.4th 106, 132.) Put differently, the trial court was not required to disregard completely a computer record because it had an inaccuracy. The trial court could properly determine what weight to give the computer records. The trial court recognized the time discrepancies but found the "close proximity" of the times showed that appellant had used the Turnage ATM card. We find substantial evidence to support this finding.

Detective Hecht began viewing the Shell videos "at least almost five, ten minutes on either side" of the Bank of the West times and he did not see anyone else use the ATM in that time period. Specifically, the recorded videos played by defense counsel during the hearing shows that no one used the ATM in the brief interval between the Bank of the West time for the Turnage transaction (10:25 a.m.) and appellant's use of the ATM (10:28–10:30 a.m.) on October 22, 2010 or between the Bank of

---

[6] Although not determinative of our analysis on this issue, when Detective Duval was shown the videos during the hearing, he testified that "in my experience, when I go to capture surveillance video, I usually start it 20 minutes before and 20 minutes after the time . . . because there's always a discrepancy in the times."

the West transaction time (6:54 a.m.) and appellant's use of the ATM (6:58–7:00 a.m.) on October 23, 2010. It should be emphasized that this same set of circumstances occurred on two different days. This evidence strongly suggests appellant was the person who used the Turnage ATM card at the Shell station.

Although more was not required, we note the Shell station transactions increase the probative value of the videos from R&F Liquor and the 7-11, which do not directly show the ATM itself. For the R&F Liquor store visit and the two Shell station transactions, appellant's distinctive red car is captured on video, but no single other car appears in all three videos. Put differently, the videos strongly suggest that no one other than appellant was at both the R&F Liquor store and the Shell station at or near the time the Turnage ATM card was used.[7]

The 7-11 store and the Shell station are about a two-minute drive from each other, and Bank of the West records show Turnage ATM card transactions occurring about 11 minutes apart at the two locations on October 22. 2010. Appellant appears at the 7-11 at about 10:40 a.m., about 10 minutes after he completed the Shell station ATM transaction on October 22. Although video from the 7-11 store for October 23 could not be located at the time of the suppression hearing, Detective Hecht testified he observed appellant on that video within minutes of the Bank of the West time for the transaction; Bank of the West

---

[7]     We note that although the video from the ARCO station could not be found at the time of the hearing, Detective Hecht testified that the distinctive red car appeared in that video, which showed the ARCO station around the Bank of the West time for the transaction. The 7-11 store apparently did not have outdoor cameras.

records place the Shell station and 7-11 transactions six minutes apart on that date.

Finally, on October 23, 2010, as Detective Hecht was aware, appellant was observed getting into and driving the distinctive red car and he was followed to a residence on Hoover. It was at this location appellant was arrested. Appellant's use of the distinctive red car strongly suggests that he is in fact the black male in the videos.

Viewing these facts as a whole, we find a "common-sense probability" that appellant was the person using the Turnage ATM card. Since the evidence also showed that the card was used on October 21, 2010, only hours after the likely time of the Turnage robbery-murder, the evidence as a whole would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that appellant stole the card from the Turnages, that is, he committed robbery. (See *People v. Grimes* (2016) 1 Cal.5th 698, 731 (*Grimes*) [For robbery charge, " '[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt' "]; *People v. Gamble* (1994) 22 Cal.App.4th 446, 453.)

II.    *Challenges to the Search Warrant Fail.*

As the trial court correctly summarized, appellant raised five issues in connection with his motion to quash and traverse the October 23, 2010 search warrant: 1) the sufficiency of the probable cause set out in the search warrant affidavit; 2) misstatements in the affidavit that involved reckless disregard for the truth and which, if excised, negated probable cause; 3) the sufficiency of the particularity of the items to be seized;

12

4) seizures during the search exceeding the scope of the warrant; and 5) the inapplicability of the good faith reliance doctrine.

A motion to traverse is different from a motion to quash. A defendant moving to *quash* a warrant asserts the warrant on its face lacks probable cause. A defendant moving to traverse a warrant " 'mount[s] a subfacial challenge, i.e., attack[s] the underlying veracity of statements made on the face of the search warrant application.' " (*People v. Heslington* (2011) 195 Cal.App.4th 947, 957, fn. 7 (*Heslington*).) If the defendant shows deliberate misstatements or misstatements made with a reckless disregard for the truth, those statements must be excised from the warrant and probable cause must be reassessed. (*Ibid*.)

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. [Citations.] 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' [Citation.] In a pre-Proposition 8 case, we stated: 'In determining the sufficiency of an affidavit for the issuance of a search warrant the test of probable cause is approximately the same as that applicable to an arrest without a warrant, . . . [citations], namely, whether the facts contained in the affidavit are such as would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion of the guilt of the

accused.' [Citation.]" (*Kraft, supra,* 23 Cal.4th at pp. 1040–1041.) More specifically, " 'Probable cause sufficient for issuance of a warrant requires a showing that makes it " 'substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought.' " ' " (*People v. Clark* (2014) 230 Cal.App.4th 490, 496–497 (*Clark*).) " 'The affidavit must set forth more than the " 'mere conclusion' " of the affiant that the items sought are located on the premises to be searched. [Citations.] The affidavit must present the magistrate with facts indicating the circumstances underlying the affiant's belief in order that the magistrate may judge their persuasiveness for himself.' " (*Id.* at p. 497.) The magistrate's determination of probable cause is entitled to deferential review. (*Kraft,* at p. 1041.)

      A.    *The Search Warrant Was Supported by Probable Cause*

A defendant moving to quash a warrant asserts the warrant on its face lacks probable cause. (*Heslington, supra,* 195 Cal.App.4th at p. 957, fn. 7.) Thus, in reviewing the sufficiency of the facts upon which the magistrate or judge based his or her probable cause determination, "we consider only the facts that appear within the ' " four corners of the warrant affidavit." ' " (*Clark, supra,* 230 Cal.App.4th at p. 497.)

The trial court found that "the bottom line is there was usage of these cards by a person who matched the description and whose car matched the description of the defendant. And he was surveilled [for] a time. And that all was discussed earlier in terms of probable cause to arrest. [¶] But while there were discrepancies, I think a fair reading of the affidavit established probable cause."

14

Appellant contends that the trial court erred in finding probable cause for the warrant for essentially the same reason it erred in finding probable cause to arrest: There was insufficient evidence connecting him to the use of the Turnage ATM card. Appellant also contends that there were insufficient facts stated in the affidavit to identify him as the gas man who came to the Turnage property on October 21, 2010.

Although we agree with trial court that essentially the same standard applies for probable cause for a warrant as it does for an arrest, we consider probable cause for the warrant anew, as the affidavit was prepared by Detective Duval and does not include precisely the same information as Detective Hecht's testimony about probable cause to arrest. In brief, after listing the dates and times for the relevant ATM transactions, the affidavit states that "Investigators reviewed the video footage recovered from the Shell gas station and the 7-11 store. They noted that the person [us]ing the card was a male black with a thin build and a thin moustache." These are sufficient facts to show that the male black suspect was using the Turnage ATM card. The affidavit also notes that investigators "were also able to see [the suspect] enter/exit a red car, which had a black primer hood and right front fender." The area around the Shell station was placed under surveillance and later in the day, the suspect was spotted entering a red car with a black hood and right front fender. The surveillance team followed the car to 12653 South Hoover Street; the suspect entered the residence through the front door. When he exited the residence about 20 minutes later, he was arrested and identified as appellant. This is sufficient evidence to show that the person in the videos was appellant.

15

These facts, together with information in the affidavit that other credit/debit cards and jewelry were missing from the Turnage residence, were sufficient to make it " 'substantially probable that there is specific property lawfully subject to seizure presently located in' " appellant's residence. (*Clark, supra,* 230 Cal.App.4th at p. 496.) Specifically, appellant's use of the Turnage ATM card shows his conscious possession of it, and the use of the card the morning after the robbery supports an inference that he stole the card from the Turnages. (*Grimes, supra,* 1 Cal.5th at p. 731.)[8] This inference is slightly strengthened by appellant's generally similar appearance to the gas man seen at the Turnage residence on the day of the robbery-murder. This is weak evidence, as the description of the gas man was very general, but it does have some slight corroborative value.[9] Since other property was apparently taken during the robbery, it was substantially probable that other property would be found at appellant's residence.

[8] This evidence alone would, if believed by a jury, be sufficient evidence to support a conviction for theft. If considered with the evidence that cards were taken from the Turnage home while the Turnages were present and restrained, it would support a conviction for robbery.

[9] It might have been possible, as appellant suggests, for investigators to do more to connect appellant to the gas man, such as showing a photograph of appellant to the Turnage tenant who described the gas man. But, given the evidence that appellant used the Turnage ATM card, it was not necessary, particularly given the time constraints of the investigation and the low quality of the still photos produced from the video. Probable cause does not require evidence sufficient to convict the suspect. (*Fischer, supra,* 49 Cal.2d at p. 446.)

We cannot agree with appellant that probable cause was lacking because the information about the times and places of the uses of the Turnage ATM card was "conclusory." Appellant bases this characterization on the fact that Detective Duval did not speak directly to McCormick, did not know her title or position at Bank of the West, and did not know the "mechanism" by which McCormick was able to determine the time and location of the Turnage ATM card usage.

In general, hearsay may be relied upon in seeking a search warrant. (*People v. French* (2011) 201 Cal.App.4th 1307, 1317.) Further, officers can make arrests based on information and probable cause furnished by other officers. (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1553.) The record shows that Detective Hecht spoke with McCormick.

We do not find conclusory the statement referring to the times and places of the Turnage ATM card usage. A conclusory statement, in this context, would be a bare statement that the card was used or that the card was used at the particular places and times given, but without any indication of the source of the information at all. The affidavit begins by stating the source of the information was Hayley McCormick "from" Bank of the West; this statement is reasonably understood to indicate she is an employee of the bank. In context, the affidavit is reasonably understood as indicating that McCormick lawfully accessed the Turnage ATM card usage information through her employer. Read as a whole, the statement on the next page of the affidavit that investigators "were advised that [the] card was used at the following ATM's" is reasonably understood as meaning that the investigators were advised by McCormick.

17

We do not see the significance of stating McCormick's exact title or position at Bank of the West, or the exact "mechanism" used by McCormick to determine the Turnage ATM card usage. McCormick's phone number was provided in the affidavit if the magistrate wanted to verify her existence or had questions about Bank of the West's records.  But generally, more details about McCormick or the computer software or hardware she used would have no meaning to a person who was not a Bank of the West employee or a specialist in banking software or hardware.[10]

B.  *The Statements in the Affidavit Were Not Made with Knowledge of Falsity or Reckless Disregard for the Truth*

A motion to traverse requires the defendant to show that: "(1) the affidavit contained 'a false statement made "knowingly and intentionally, or with reckless disregard for the truth;" and (2) "the allegedly false statement is necessary to the finding of probable cause." ' " (*Heslington, supra,* 195 Cal.App.4th at p. 957, fn. 7.)

In deciding such a motion, a trial court must first decide if the affidavit contains deliberately false statements or statements made in reckless disregard for the truth.  If so, the statements must be excised and the affidavit retested for probable cause. This rule applies to omissions as well as affirmative statements. Mere negligence is not enough.  Put differently, we do not excise inaccurate statements which are the result of negligence.

---

[10]    Given the short time period involved, it is virtually certain McCormick accessed Bank of the West's electronic/computer records for the Turnage account and saw the transactions.

18

Appellant contends that the statements about his card usage are inaccurate, and the trial court erred in denying his motion to traverse the warrant. The trial court ruled: "I . . . don't find that there was a reckless disregard for the truth. There was a lot of information being transferred among officers on a very immediate basis. And while that doesn't excuse [lack of] attention to detail, I just don't find that there was recklessness here." We defer to this finding if supported by substantial evidence.

" '[When] the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing' (emphasis in original). This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." (*Franks v. Delaware* (1978) 438 U.S. 154, 164–165 (*Franks*).) Thus, it is not enough for a defendant to simply show a discrepancy between the actual facts and the facts given in the affidavit. (*People v. Costello* (1988) 204 Cal.App.3d 431, 442.)

Appellant contends the phrase "investigators responded to these locations . . . and obtained video footage from the ATM's" indicates that the actual transactions involving the Turnage card could be observed in each of the videos for the October 21 and 22,

19

2010 transactions.[11]  We agree in part.  This phrase could be understood as suggesting that the Shell station and 7-11 videos showed appellant actually using the Turnage card, when considered with the later statement that "[i]nvestigators reviewed the video footage recovered from the Shell gas station and the 7-11 store.  They noted that the person [us]ing the card was a male black with a thin build and a thin moustache."[12]

Appellant also claims there is a misleading omission in the affidavit because it does not specify that the Shell station video times do not precisely match the Bank of the West times for the Shell station ATM transactions.  We agree that this information is not included in the affidavit.

Essentially, appellant's argument was that Detective Duval displayed reckless disregard for the truth because he made statements about the contents of the surveillance videos when he had not actually viewed those videos.  Detective Duval recalled that he relied on other officers' accounts of the videos' contents,

---

[11]     The affidavit states: "the [victim's] debit card had been used at 'R&F Liquor Store,' . . . on October 21, 2010 at 1617 hours.  It had also been used at the 'Shell Gas Station,' located at 854 West El Segundo Boulevard . . . on October 22, 2010, at 1025 hours, and at the '7-11' store located at 861 West Rosecrans Avenue . . . on October 22, 2010, at 1036 hours.  Investigators responded to those locations [and] obtained the video footage from the ATM's."

[12]     We do not find that the affidavit can reasonably be understood as indicating that appellant was directly shown using the ATM in the videos from R&F Liquor, the ARCO station or J&S Liquor.  The affidavit does not state that investigators viewed the video from the R&F Liquor ATM, or that they viewed any video from the ARCO or J&S Liquor.

20

but he did not recall which officers. Detective Duval believed that the officers were the ones who were tasked with obtaining and viewing the video. Detective Hecht confirmed that the information in the affidavit "pretty much all" came from him as the lead investigator, and that he had viewed the videos.

It was permissible for Detective Duval to rely on another officer's investigation, including viewing the videos, and on hearsay. Thus, Detective Duval's failure to view the video does not show reckless disregard for the truth.

As to Detective Hecht's statements, appellant relied on the fact of the inaccuracies to show reckless disregard for the truth. Appellant did not point to any specific evidence of Detective Hecht's behavior that showed the inaccuracies and the omission were the product of reckless disregard. He simply argued that Detective Hecht had a responsibility to be accurate, or as accurate as possible. More is required.

We note that the investigation into the Turnage robbery-murder was large and fast moving. Different teams handled different aspects of the investigation. Detective Hecht had the task of viewing the videos. His first viewing took place the morning of October 23, 2010 and by the evening of October 23 appellant had been arrested. It was at this point that the search warrant needed to be prepared. Detective Hecht assigned the task of writing the affidavit to Detective Duval, an experienced officer who was part of the investigation. Detective Hecht and his partner met with Detective Duval and his partner to convey the information about the video content. Nothing about this process suggests a reckless disregard for the truth.

Further, Detective Hecht had not slept the night before, and fatigue, coupled with the stress of a fast-paced investigation,

21

provide the most likely explanation for the inaccuracies about the videos.  At most, this would be negligence.

We recognize that the record in this case is itself full of discrepancies which make it hard to assess what happened concerning the transmission of information for the affidavit.  As the trial court discussed at length: "I think everybody can agree that the testimony that was taken during the hearings had some discrepancies internally in terms of what officers testified to, what they later recalled after being refreshed, what was in the affidavit . . . . [¶] How much of it was based on lack of recollection, how much of it was based on surmising, how much of it was based on what one hoped would have been there, I mean it runs the gamut in terms of bases for the discrepancies. [¶] But I don't think anybody can say there weren't discrepancies in what each officer testified to himself, what officers testified to in relation to each other, and what ultimately the pieces of evidence that were displayed showed.  That I think is clear. [¶] . . . [¶] And it was exacerbated, I think, by the fact that there were multiple days, multiple images, and it all happened a while ago, that is like seven or eight years ago.  So I mean, I think all of that contributed to—to some of the discrepancies in the testimony itself.  I know at times I had a hard time keeping track of which event was being discussed."

Given the state of the record, we note that even if we assumed for the sake of argument that Detective Hecht had acted with reckless disregard for the truth, we would not find that appellant would prevail on his motion.  When a defendant has shown reckless disregard, we correct the affidavit and then retest it to determine whether it supports probable cause.  (*Franks*, *supra*, 438 U.S. at pp. 171–172; *People v. Eubanks* (2011) 53

Cal.4th 110, 136.) Under that analysis, we would strike the phrase "from the ATM's" from the affidavit so that it simply reads "Investigators responded to those locations [and] obtained the video footage." We would change the next challenged sentence to read: "They noted that the 7-11 and Shell station videos showed a male black with a thin build and a thin mustache, but only the Shell station videos directly showed the male using the card."[13] We would also correct the statement about investigators seeing the distinctive red car to clarify where it was seen by investigators: at the Shell station, R&F Liquor, and the ARCO station, but not at the 7-11. Finally, we would add the specific times provided by Bank of the West for the transactions and the times shown on the Shell station videos.

We find this corrected version sufficient to show probable cause that appellant was the person using the Turnage ATM card. The time differences are minor. Further, appellant used the same Shell station ATM within minutes of the Bank of the West time two days in a row. While the corrected affidavit no longer states that the 7-11 video directly shows appellant using the ATM or exiting/entering the distinctive red car, the corrected affidavit still places appellant at R&F Liquor and the ARCO station (through the presence of his distinctive red car) and at the 7-11 store, all near the time that the Turnage ATM card was used at those locations. Coupled with the strong evidence provided by the Shell station videos, this is sufficient to show

---

[13]    Arguably, to make the statement entirely accurate, it would be changed to read: "All the videos show the presence of a think black male with a thin build and a thin mustache, but only the Shell station videos directly show him using the card."

23

probable cause to believe that appellant was the person using the Turnage ATM card. Thus, the warrant remains valid.

C. *The Warrant Satisfied the Particularity Requirement*

Both the United States and California Constitutions require a search warrant to provide a "particular" description of the property to be seized. (*People v. Robinson* (2010) 47 Cal.4th 1104, 1132 (*Robinson*).) "The purpose of the 'particularity' requirement of the Fourth Amendment is to avoid general and exploratory searches by requiring a particular description of the items to be seized." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1296 (*Bradford*).) Put differently, "a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings." (*Robinson*, at p. 1133.)

"In the context of the Fourth Amendment, ' "[p]articularity is the requirement that the warrant must clearly state what is sought." ' " (*Robinson, supra,* 47 Cal.4th at p. 1132.) A warrant " 'need only be reasonably specific' [citation], and 'the specificity required "varies depending on the circumstances of the case and the type of items involved." ' " (*Ibid.*) "The requirement of reasonable particularity 'is a flexible concept, reflecting the degree of detail available from the facts known to the affiant and presented to the issuing magistrate.' " (*Ibid.*)

" 'Whether the description in the warrant of the property to be seized is sufficiently definite is a question of law on which an appellate court makes an independent judgment.' " (*People v. Tockgo* (1983) 145 Cal.App.3d 635, 640.)

Appellant contends the description of the property in the warrant was so deficient that it essentially authorized a general search. We cannot agree.

24

The property to be seized is listed in Attachment B to the warrant: "Any credit/debit cards in the name of Victim Leamon C. Turnage, or Victim Robyn Turnage, or identification in the victim's names, or the previous that is not in the name of anyone else not residing at the location.  Any jewelry that can be shown to the victim's family for identification at a later date.  Any items that can be used for binding purposes such as electrical tape, duct tape, packaging or shipping tape, rope, cord or string.  Two oral saliva samples from the interior of John Ewell's mouth."

There was no need to specify the precise credit/debit cards by the issuing financial institution believed to have been stolen from the Turnages.  Any such card in their name found at appellant's residence would be the proceeds of the robbery and subject to seizure.  The same is true for identification in the Turnages' names.

Under the circumstances, the officers had no ability to be more specific in describing the jewelry stolen from the Turnages. Assuming the Turnage children could have looked at the house and determined which exact jewelry items were missing, as appellant contends, the children lived in Florida; the daughter (or daughter-in-law) had just had a baby and so could not easily travel.  Thus, it was reasonable to seize any jewelry until it could be determined what precisely had been taken from the Turnage residence.

Similarly, under the circumstances of the investigation and the facts known to the officer, the inclusion of items not visible on the Turnage bodies in the list of items that could be used for binding, such as "duct tape, packaging or shipping tape" was not overly broad.  At the time of the search, it was known through observation of the bodies that electrical tape was used to bind the

Turnages, as were certain cords. The search took place about 24 hours after the bodies were found, however, and it is unlikely that all the binding materials on the bodies had been fully analyzed. Thus, other forms of tape might have been used and it was reasonable to include those forms the items to be seized. We do agree that any credit/debit cards or identification cards in the names of anyone not residing at the residence was broad, and that there was no specific evidence that appellant had robbed anyone other than the Turnages. At the same time, such items would have an apparently incriminating character, and would be seizable under the plain view doctrine. Thus, the inclusion of this category of items was generally unnecessary. We note that even if the category should have been included, it would not render the warrant facially deficient, or invalidate the warrant as a whole. (See *Bradford, supra,* 15 Cal.4th at pp. 1292–1293; *People v. Joubert* (1983) 140 Cal.App.3d 946, 952.)

D. *The Scope of the Search Warrant Was Not Knowingly Violated*

It is undisputed that at least three items seized from appellant's residence and multiple items seized from appellant's car fell outside the scope of the search warrant as written. Appellant focuses primarily on the day planner seized during the residential search which contained the address of the Morcos murder. For reasons that are not clear from the record, the trial court and counsel treated this item as if it were evidence of appellant's dominion and control of the residence. This created a problem because Attachment B makes no reference to items showing appellant's dominion and control over the residence.

26

A dominion and control provision is very common in search warrants. (See, e.g., *People v. Balint* (2006) 138 Cal.App.4th 200, 206 [provision is "a standard feature in search warrant practice"].) There is no reason to believe the magistrate would have rejected the warrant in this case if it had included such a provision, or asked that the provision be stricken. Detective Duval testified he normally included such a provision in the list of property to be seized, and in hindsight believed he had inadvertently omitted it from this warrant because he was working from a different station and did not have access to the templates he normally used. The trial court found this testimony credible and we agree.

The fact remains that the provision is not in the warrant. None of the officers who participated in the search, with one possible exception, received or read a copy of the search warrant or affidavit. Sergeant Chris Cognac testified he had "read the fact that it had been signed by a judge and that we were searching for documents pertaining to the crime." He later added he was told to look for items that would link appellant to the residence being searched. All the other officers also believed they had been told verbally to search for documents showing appellant's control over the residence, but none could remember the specific individual who made that statement.

Trial counsel and the trial court then analyzed this omission as one involving good faith reliance on an oral representation of the warrant's contents and analyzed this issue under the framework of *United States v. Leon* (1984) 468 U.S. 897 (*Leon*). We agree with appellant that the specific application of the "good faith" rule found in *Leon* is not directly applicable to this case. (*Ibid*).

Under *Leon*, the good faith exception applies when a law enforcement officer relies on a warrant issued by a neutral magistrate which is facially valid but is later determined by a court to lack probable cause. (*Leon*, *supra*, 468 U.S. at p. 901.) The officer's reliance on the warrant must be objectively reasonable. For example, the affidavit must not be so devoid of indicia of probable cause that an officer's belief in the existence probable cause would be unreasonable. The mistake considered in *Leon* was one by a magistrate, and so the *Leon* analysis does not apply directly to reliance on mistaken statements of probable cause made by law enforcement officers.

We also agree with respondent's contention on appeal that the "good faith" rule first articulated in *Leon* "was never intended to be restricted to [the] specific circumstances" of *Leon*. Rather, *Leon* was only one fact-specific application of the cost-benefit analysis that is the core of the exclusionary rule. (See *Davis v. United States* (2011) 564 U.S. 229, 238 ["The basic insight of the *Leon* [good faith] line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue"].)

We further agree with respondent that the "good faith" rule has been expanded since *Leon*, to cases other than those involving facially valid search warrants which are subsequently invalidated. But, under this line of cases, the source of the mistake still matters. It was not until its decision in *Herring v. U.S.* (2009) 555 U.S. 135 (*Herring*) that the Supreme Court applied the rule to an officer's reliance on a mistake by other law enforcement personnel. In that case, two different law enforcement agencies were involved, one for Coffee County and one for Dale County. (*Ibid.*) This case similarly involves two

28

different law enforcement agencies: LASD and HPD.[14]  The record is clear that LASD prepared the search warrant application, based on evidence LASD had developed, and submitted the application to a magistrate; the record strongly indicates that HPD officers performed the actual search of the residence.  *Herring* requires that we look at the conduct of all the officers involved.

The HPD officers' reliance on LASD's statement that the search warrant prepared by LASD included a dominion and control category, was objectively reasonable and in good faith.  As we have discussed, this is an extremely common, virtually routine, category for residential search warrants.  There was no reason for HPD officers to doubt its presence, or even to seek to confirm that presence by requesting a copy of the warrant.

The second part of this analysis, the conduct of LASD personnel, is less straightforward because the record is less clear on LASD conduct.  First, it is not clear which LASD officer told the HPD personnel about the content of the warrant.  Detective Duval appears to have been at a nearby LASD station when the magistrate faxed back the approved warrant, and then began driving to the South Hoover residence.  Detective Duval said he called officers at the residence and told them he had a signed search warrant and was en route.  According to Detective Duval, that would normally be when search assignments were given.  It

---

[14]    The two agencies were, to a degree, working together.  Thus, the attenuation present in *Herring* is not present here.  As the California Supreme Court has pointed out, "the Supreme Court's general holding [in *Herring*] regarding what conduct triggers the exclusionary rule does not focus on the issue of attenuation." (*Robinson, supra,* 47 Cal.4th at pp.1125–1126.)

is reasonable to infer that this is when the mistake occurred, that is, Detective Duval did not attempt to read the warrant aloud while en route, but relied on his (mistaken) memory of preparing the warrant application.[15]  When Detective Duval arrived at the Hoover residence, he may have simply repeated the mistake he made in the car, now engrained in his memory.  We do not condone Detective Duval's failure to read the warrant as approved (or perhaps to read it carefully), but under the circumstances of this case, it is at most negligence.  Not only was the omitted category a common one which was a part of Detective Duval's normal search warrant template, but inclusion of the category only resulted in the seizure of two documents showing appellant's dominion and control of the residence: two letters addressed to appellant at the South Hoover address.  Thus, there is no basis to conclude that Detective Duval deliberately inserted this category into the search warrant for some nefarious reason.

The record also indicates that the omission was the product of an unusual circumstance which was not likely to recur.  Detective Duval prepared the warrant application at a station where he did not normally work, and where he had difficulty accessing templates.  Thus, there would be no significant deterrent effect from excluding any evidence found that fell into the omitted category.

We note that the dominion and control category only appears to apply to two pieces of mail addressed to appellant at

---

[15]     We note we cannot rule out an incomplete reading of the warrant, that is, that Detective Duval glanced at Attachment B, recognized the first line of the text he had written, which was specific to the Turnage robbery-murders and did not read further.  This would not change our conclusion.

the South Hoover address. The item most discussed in the trial court in connection with the good faith rule does not, on the record before us, show appellant's dominion and control over the South Hoover residence. There is nothing to indicate that the day planner displayed the Hoover address, or even information about the Hoover address which might support an inference of dominion and control.[16] Rather, good faith reliance on the dominion and control category was used primarily to justify the decision to open the day planner. As we explain below, officers were permitted to look inside the day planner under the search warrant as written, that is, without the dominion and control category.

   1.    <u>The Residence Search Through Discovery of the Day Planner</u>

A number of items outside the scope of the search warrant were recovered in the residence search. Of most concern to appellant is the Morcos address found in the day planner. The CVS receipt and the paper with addresses of coin collectors, found by Sergeant Cognac, were also the subject of testimony at the hearing, although primarily to support the argument that the search turned into a general search for evidence related to the Morcos murder.

We agree with the trial court that it is appropriate to analyze the house search under the plain view doctrine. "The plain-view doctrine permits, in the course of a search authorized by a search warrant, the seizure of an item not listed in the

---

[16]    The same is true for the CVS receipt and the foreign coin collectors' addresses, the other items recovered in the residential search which were also discussed at length in the trial court.

31

warrant, if the police lawfully are in a position from which they view the item, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object. (*Horton v. California* (1990) 496 U.S. 128, 135–137 [110 S.Ct. 2301, 2307–2308, 110 L.Ed.2d 112]; *Texas v. Brown* (1983) 460 U.S. 730, 739 [103 S.Ct. 1535, 1541–1542, 75 L.Ed.2d 502] (plur. opn.); see *Minnesota v. Dickerson* (1993) 508 U.S. 366, 374–375 [113 S.Ct. 2130, 2136–2137, 124 L.Ed.2d 334].) In such circumstances, the warrantless seizure of evidence of crime in plain view is not prohibited by the Fourth Amendment, even if the discovery of the evidence is *not* inadvertent. (*Horton v. California*, *supra*, 496 U.S. 128, 130 [110 S.Ct. 2301, 2304].)" (*Bradford, supra*, 15 Cal.4th at pp. 1293–1294.)

We begin with the second part of the doctrine first. As the U.S. Supreme Court has explained, the doctrine does not require inadvertence because "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant." (*Horton, v. California, supra*, 496 U.S. at p. 138 (*Horton*).) Thus, if an officer "has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first." (*Id*. at p. 139.) Put differently, the officers' interest in evidence relating to the Morcos murder, if any, would not alone bar application of the plain view doctrine.

32

Here, the warrant authorized the officers to search for credit/debit cards, identification cards, and jewelry, and so they could look anywhere such items might be found. All the items seized in this case were found in locations where cards and jewelry might be found, or in plain view on a piece of furniture.[17] Specifically, a card could be concealed inside a day planner of the sort recovered here. Thus, officers were permitted to look inside the day planner to see if any cards were present. We note that the photograph of the page with the Morcos address on it, as shown in the record on appeal shows several smaller scraps of paper resting on or attached to the page opposite the page with the address; the added thickness of the paper would make this natural place to open the day planner if one was searching for a concealed credit card. Testimony of some of the officers at the scene indicates it was also the first page of the day planner, which would also be a natural place to look for hidden items.

The second part of the plain view doctrine requires that the "incriminating character" of the seized item be "immediately apparent." (*Horton, supra,* 496 U.S. at p. 136.) The trial court found that the officers "came across items that they had probable cause to believe were related to another crime." Appellant contends there is nothing obviously incriminating about the address in the day planner, but does not specifically discuss the writing on its first page.[18]

---

[17] In three instances, a bag or box containing the items was also seized.

[18] Appellant does not argue that the CVS receipt and coin collector addresses were not incriminating, only that they were not incriminating as to the Turnage murders. He appears to focus on these two items as the beginning of what he

33

In this context, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' [citation], that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." (*Brown, supra,* 460 U.S. at p. 742.) The items need not be "associated with a *particular* crime as a prerequisite to their seizure; . . . it is sufficient that the investigators have probable cause to believe the item is evidence of *some* crime." (*Kraft, supra,* 23 Cal.4th at p. 1043.)

Sergeant Cognac did not describe his initial reaction to the day planner in detail, but did say that he thought it was "odd" that there was someone else's address in the day planner. His testimony that he then "ran" the address supports an inference that upon first seeing the page, he believed that it might be useful evidence of some crime. Although not articulated by Sergeant Cognac, the relevant page of the day planner does not merely include an address without an identifying name attached, which is somewhat odd. More significantly, the page also displays the words "Stealing" and "Prison." A person of reasonable caution would be warranted in the belief that the day planner would be useful evidence of some crime, and so its seizure was proper.

characterizes as an expanded and tainted search for evidence connecting him to the Morcos murder. Accordingly, we do not discuss the incriminating character of these items. We consider appellant's other claims below.

34

Assuming for the sake of argument that Sergeant Cognac did actually "run" the address and that running the address would constitute an investigation, that does not retroactively negate the facially apparent incriminating value of the page, or the inference that Sergeant Cognac initially recognized it as useful evidence of *some* crime.

Although not necessary to our conclusion on this claim, we note that substantial evidence supports finding that Sergeant Cognac in fact learned of the significance of the address from his fellow HPD officers. According to HPD Detective Bradley Jackson, Sergeant Cognac found the day planner inside a bag and showed the address to Detective Jackson and HPD Detective Vincent Arias. They recognized it as the Morcos address. HPD Lieutenant Gary Tomatani testified that his best recollection was that he was shown the day planner by Sergeant Cognac, and he immediately recognized the address as the Morcos address. This would be odd behavior for someone who already knew the significance of the address. More generally, Detective Duval testified that HPD officers who were present for the search recognized the address as the Morcos address and advised him of that.

If this were the case, simply showing an item to fellow officers would not constitute an investigation that would bar application of the plain view doctrine, regardless of the motivation for doing so. That is especially true here, where the procedure for the search involved the searching officers contacting one of the supervising officers and showing them an item potentially subject to seizure. The procedure then called for one of the supervising officers to recover the item, if appropriate, simplifying the chain of custody. Specifically, the testimony

indicated that although Cognac may have first located the day planner, it was ultimately "recovered" by Sergeant Garcia.

### 2. Searches after Discovery of the Day Planner

As mentioned above, after Sergeant Cognac found the day planner, he also recovered two items which appellant characterizes as related to the Morcos murder: the CVS receipt and the list of coin collectors' addresses. Law enforcement officers searched appellant's impounded red car on October 24, October 27 and October 29, 2010 and ultimately seized a significant number of items. Appellant moved to suppress all seized items, but only discussed in depth the CVS receipt and the coin collectors' addresses recovered by Cognac during the house search and the blue coin purse with foreign coins and the black briefcase with documents, seized by Detective Hecht from the car on October 24. He characterizes these four items as related to the Morcos murder.

On appeal, appellant contends the trial court erred in denying his motion to suppress all items related to the Morcos murder seized after the Morcos address was found in the day planner, because those items are fruits of the poisonous tree and should have been excluded for that reason. (*Wong Sun v. United States* (1963) 371 U.S. 471.) Put differently, appellant contends that the discovery of the Morcos address was the "catalyst following which the search of the home expanded into a far broader search for items relating to the Morcos homicide" including the subsequent searches of the car and seizures of items within on October 24 and 27, 2010. Appellant contends that the search was further broadened on October 29 into a seizure of every item in the car that might possibly be related to any other crime.

The short answer to appellant's argument is that we have found the day planner was properly seized, as set forth above. Thus, there is no poisonous tree.

We recognize appellant also believes both that the search was expanded or broadened after the discovery of the day planner, and that this was improper.

We do not agree that the search was "expanded" into a "broader" search. During the search of the residence, Cognac did recover two items which appellant contends are linked to the Morcos murder, but there is no evidence that he made a special effort to look for such items. When asked if he believed that he could search for other evidence relating to the Morcos murder after finding the address in the day planner, Sergeant Cognac replied: "Search for things in the search warrant. If they led to another homicide, then they led to another homicide." Detective Duval acknowledged that after the Morcos address was discovered, a number of HPD officers mentioned that the murder involved the theft of foreign coins, and so the officers searching the residence were "also" going to be looking for foreign coins. We see nothing improper about this, particularly since coins would be found in the same size spaces where jewelry would be found, and the warrant specifically authorized a search for jewelry. No coins were in fact recovered from the residence on October 23, 2010.

Turning to the car searches, we see no significance in LASD Sergeant MacArthur, an investigator on the Morcos murder, accompanying Detective Hecht to the vehicle search on October 24, 2010. (See *People v. Carrington* (2009) 47 Cal.4th 145, 167 [officers from another jurisdiction may accompany officers conducting a search pursuant to a warrant without tainting the evidence uncovered in the process, even when the accompanying

37

officers lack probable cause for their own search warrant].)
Detective Hecht stated his belief that the coin purse and briefcase
recovered on that date were incriminating as to the Turnage
murders, but even if it turned out that they were in fact
incriminating as to the Morcos murders, Detective Hecht's
seizure was permissible under the plain view doctrine.

Detective Hecht recovered very few items from the car on
October 24, 2010, and he described the car as having "a lot of
items" in it.[19] We see nothing improper about a continued search
of the car on October 29.[20] The October 23, 2010 warrant was
still valid on that date. (§ 1534 ["A warrant executed within the
10-day period shall be deemed to have been timely executed and
no further showing of timeliness need be made"].)[21] Detective
Hecht acknowledged that he was also looking for items that could
connect appellant to any other known homicides. As we have
discussed above, an officer is permitted to search for items for

---

[19] Ultimately, detectives filled four boxes with items from the
car, which constituted only a majority of the items in the car, not
all.

[20] The car was impounded, and multiple searches in such
situations are not uncommon. (See, e.g., *People v. Superior Court
(Nasmeh)* (2007) 151 Cal.App.4th 85 (*Nasmeh*).)

[21] "As a general proposition, ' "[t]he Fourth Amendment does
not specify that search warrants contain expiration dates." '
[Citation.] '[C]ompleting a search shortly after the expiration of a
search warrant'—a time period governed in this state by section
1534—'does not rise to the level of a constitutional violation and
cannot be the basis for suppressing evidence seized so long as
probable cause continues to exist, and the government does not
act in bad faith.' " (*Nasmeh, supra*, 151 Cal.App.4th at p. 99.)

which he does not have probable cause as long as he is in a place where he is entitled to be; he may seize the items if they have an apparently incriminating character.

Although Detective Duval's reasons for searching the car on October 27, 2010 are not clear, he was not present for the October 24 search and it would certainly be acceptable for him, as an investigating officer in the Turnage murder case, to search the car personally. Although Detective Duval did recover documents related to the Morcos murder, it was permissible for him to search for such items because he was in a place where he is entitled to be and appellant does not dispute the incriminating character of the items.

### DISPOSITION

The judgment is affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

GRIMES, J.

VIRAMONTES, J.